UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

JOEL W. FREDERICK,

                Plaintiff,

      v.

STATE OF NEW YORK, OFFICE OF
MENTAL HEALTH, ROCHESTER
PSYCHIATRIC CENTER, COLOMBA
MISSERITTI, Director of Human Resource
Management, JOSEPH COFFEY, Director
of Facility Administration, DOUG LEE,
Associate Personnel Administrator, JOHN
BURROWS, Bureau of Employee Relations
Representative, PHILLIP GRIFFIN, Executive
Director, DR. GUTTMACHER, Clinical
Director, SGT. DAVID REED, Safety
Department Representative, TIM COLES,
Maintenance Supervisor II,

                Defendants.

**DECISION AND ORDER**

6:16-CV-06570 EAW

---

## INTRODUCTION

Plaintiff Joel W. Frederick ("Plaintiff") raises a series of claims arising from his employment with Defendant Rochester Psychiatric Center ("RPC"), including from a mental hygiene arrest[1] that was effected based upon the representations of several RPC employees. Plaintiff alleges violations of § 504 of the Rehabilitation Act of 1973

---

[1]    Plaintiff and Defendants use the term "mental hygiene arrest" and "mental health arrest" interchangeably to refer to the same event. Plaintiff's arrest was effected pursuant to a provision of the New York Mental Hygiene Law. As such, the Court refers to Plaintiff's arrest as a "mental hygiene arrest."

("Rehabilitation Act"), 29 U.S.C. § 794, for discriminatory treatment due to a perceived disability and retaliation for opposing discrimination based on that perceived disability; New York Labor Law § 740; and 42 U.S.C. § 1983, for alleged deprivation of his federal constitutional rights by state employees, including retaliation against him for exercising his First Amendment rights, false arrest and imprisonment, and abuse of process. (Dkt. 2 at 2). Presently before the Court is Defendants' motion for summary judgment. (Dkt. 40). For the following reasons, Defendants' motion is granted in part and denied in part.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff began working for the New York State Office of Mental Health ("OMH") at the RPC as a general mechanic in May of 2011, and remains employed in that same capacity. (Dkt. 40-1 at ¶¶ 1-2; Dkt. 44-1 at ¶¶ 1-2). Plaintiff described his mechanic duties as "general maintenance," including "work[ing] on locks," "painting, plumbing, drywall work, doors, hardware, framing, . . . carpentry[,] or mechanical repairs." (Dkt. 40-3 at 22).

On August 8, 2015, Plaintiff was involved in an incident with his supervisor, Ron Germain ("Germain"). Plaintiff claims that Germain, using an explicative, threatened to throw Plaintiff out the window if he did not "shut up." (Dkt. 40-1 at ¶ 4; Dkt. 44-1 at ¶ 4.1). Plaintiff did not report this incident until almost six months later, after Germain reduced Plaintiff and his coworker's access to overtime hours. (Dkt. 40-1 at ¶¶ 5, 12-13; Dkt. 44-1 at ¶¶ 5, 12-13).

Separately, in September 2015, Plaintiff was involved in a domestic incident. Plaintiff's then-girlfriend contacted the police after Plaintiff allegedly sent her a text message of a picture of himself holding a gun to his head. (Dkt. 40-1 at ¶ 6; Dkt. 44-1 at

¶ 6). The police then confiscated Plaintiff's lawfully possessed guns, and placed Plaintiff under mental hygiene arrest pursuant to the New York Mental Hygiene Law. (Dkt. 40-1 at ¶ 7; Dkt. 44-1 at ¶ 7). Plaintiff was discharged the following day. (Dkt. 40-1 at ¶ 8; Dkt. 44-1 at ¶ 8). After the incident, Plaintiff told a "couple of co-workers" that he had a "domestic dispute" with his girlfriend and "that the police took [his] guns for an off period." (Dkt. 40-3 at 37, 42-43).

On Friday, February 5, 2016, Plaintiff met with Germain. Plaintiff was told that locksmith Thomas DeMarco ("DeMarco") would respond to requests outside of working hours relating to lock repairs. (Dkt. 40-1 at ¶ 11; Dkt. 40-3 at 52, 184; Dkt. 44-1 at ¶¶ 11-11.1). Plaintiff and his coworker were asked to turn over their master keys. (*Id.*). Plaintiff was also told that going forward, he and his fellow mechanic would be "secondary responders." (Dkt. 40-3 at 52). This meant that if the locksmith took every such request, Plaintiff and his co-worker would not receive overtime work (and presumably overtime pay). (*Id.*).

Later that day, Plaintiff complained to Defendant Joseph Coffey ("Coffey"), Director of Facility Administration, about Germain's decision to reduce his access to overtime pay and, for the first time, complained about Germain's alleged comment made some six months earlier, threatening to throw Plaintiff out the window. (Dkt. 40-1 at ¶¶ 12-13; Dkt. 44-1 at ¶¶ 12-13). Coffey advised Plaintiff to file a workplace violence report with respect to the alleged comment. (Dkt. 40-1 at ¶ 14; Dkt. 44-1 at ¶ 14).

On Monday, February 8, 2016, Plaintiff met with Defendant Doug Lee ("Lee"), Associate Personnel Administrator, and completed a Violence Reporting Form. (Dkt. 40-1

at ¶¶ 15, 17; Dkt. 40-3 at 65, 241; Dkt. 44-1 at ¶¶ 15, 17).  On the section of the form that asked for a description of what occurred, Plaintiff indicated that he, Germain, and Demarco were working on a "new matrix for Control Rm [sic] Keyboard."  (Dkt. 40-3 at 241). Plaintiff wrote: "When I mentioned something was out of order Mr. Germain told me to shut up before he throws me out the window." (*Id.*).  In response to a separate prompt on the form asking how the event ended, Plaintiff responded: "In total fear of Mr. Germain, constantly working in a hostile environment, was not reported immediately in fear of retaliation." (*Id.*).  Plaintiff later met with Defendant RPC Executive Director Phillip Griffin ("Griffin") and Lee to further discuss Germain's threat and the loss of potential overtime.  (Dkt. 40-1 at ¶ 16; Dkt. 44-1 at ¶ 16).

On February 29, 2016, Plaintiff was informed that his workplace violence complaint was not substantiated.  (Dkt. 40-1 at ¶ 18; Dkt. 44-1 at ¶ 18).  Later that day, Plaintiff completed a New York State Department of Labor Public Employee Safety and Health Bureau form entitled "Notice of Alleged Safety or Health Hazards," complaining about Germain's alleged threat and RPC's determination that this conduct did not constitute workplace violence.  (Dkt. 40-1 at ¶ 19; Dkt. 40-3 at 245; Dkt. 44-1 at ¶ 19).  This complaint was received by the Department of Labor on March 2, 2016.  (Dkt. 40-1 at ¶ 20; Dkt. 44-1 at ¶ 20).

Defendants allege that on March 1, 2016, Plaintiff met with his supervisor, Defendant Timothy Coles ("Coles"), and made a series of concerning statements regarding Germain and his decision about locksmith overtime, including statements that Germain "doesn't know who he is messing with and I am sick of his shit" and that Plaintiff

previously had his personal firearms taken away. (Dkt. 40-1 at ¶¶ 21-23). Plaintiff admits that he had a conversation with Coles regarding his personal firearms, but denies speaking with Coles on March 1 and making the statements that Coles attributed to him. (Dkt. 40-3 at 82; Dkt. 44-1 at ¶¶ 21.1).

Coles testified that he had also been approached by staff members DeMarco, Charles Smith, and John Gaede ("Gaede") about Plaintiff's behavior. (Dkt. 40-3 at 286-91). According to Coles, Charles Smith told him that Plaintiff said "something big is going to happen Friday" and that he "wouldn't be here after that," and DeMarco told him Plaintiff stated "I don't need my guns. I can use a bow and arrow." (*Id.* at 287-89). Plaintiff disputes making these statements but does not dispute that Charles Smith and DeMarco reported these alleged statements to Coles. (Dkt. 44-1 at ¶¶ 25-25.2).

Based on his observations and concerns about possible workplace violence, that same day (March 1, 2016), Coles contacted his supervisor, Coffey. (Dkt. 40-1 at ¶¶ 27-28; Dkt. 44-1 at ¶¶ 27-28). After his discussion with Coffey, at Coffey's request, Coles documented his concerns in an email. (Dkt. 40-1 at ¶¶ 29-30; Dkt. 44-1 at ¶¶ 29-30). This email was then forwarded to Defendant Columba Misseritti ("Misseritti"), Associate Director of Human Resources. (Dkt. 40-1 at ¶¶ 18, 31; Dkt. 44-1 at ¶¶ 18, 31). After an additional email exchange, Misseritti interviewed Coles at approximately 2:30 p.m. on March 1. (Dkt. 40-1 at ¶ 34; Dkt. 44-1 at ¶ 34).

Shortly thereafter, Misseritti and Lee interviewed employee DeMarco, who confirmed hearing the bow and arrow comment. (Dkt. 40-1 at ¶¶ 39-40; 40-3 at 335). According to Misseritti, DeMarco also "placed [employee] Craig Smith in the area." (Dkt.

40-3 at 335). Misseritti and Lee then interviewed Craig Smith, who likewise confirmed hearing Plaintiff make this comment. (Dkt. 40-1 at ¶ 40). Plaintiff disputes making these statements but does not dispute that DeMarco and Craig Smith separately spoke with Misseritti and Lee and reported to them that Plaintiff made these comments. (Dkt. 44-1 at ¶¶ 39-40). Following these interviews, Lee and Misseritti then spoke with Defendant John Burrows ("Burrows"), Bureau of Employee Relations Representative, and were given the authorization to place Plaintiff on administrative leave.[2] (Dkt. 40-1 at ¶ 41; Dkt. 44-1 at ¶ 41).

On March 2, at about 9:00 a.m., Germain met with Lee and Coles. Germain expressed fear that his family might be harmed by Plaintiff, and Germain was granted permission to leave RPC grounds. (Dkt. 40-1 at ¶ 45; Dkt. 44-1 at ¶ 45). Lee and Misseritti then interviewed Charles Smith at approximately 9:30 a.m., who confirmed hearing Plaintiff state that something big would be happening on Friday and Plaintiff would not be at RPC after that day. (Dkt. 40-1 at ¶ 46). Charles Smith also reported that Plaintiff said he was "getting to" Germain, since Germain apparently had to go to the doctor, and that Plaintiff told him that Plaintiff had been "mental hygiene arrested" and his guns were taken away, but that he was trying to get them back. (*Id.* at ¶ 47). Finally, Charles Smith told

---

[2]     As discussed below, Defendant Burrows' motion to dismiss was granted by the Court on February 3, 2017. (Dkt. 26). Plaintiff was granted leave to replead his Amended Complaint against Burrows but did not do so. In the motion presently before the Court, the parties have offered little information regarding Burrows' title and job duties. Documents submitted by Plaintiff from the New York State Department of Labor suggest that Burrows was RPC's OMH Bureau of Employee Relations Representative (Dkt. 44-3 at 56), but none of the parties have explained his role.

Lee and Misseritti that Plaintiff also "mentioned something about suicide." (*Id.* at ¶ 48). Plaintiff disputes making these comments but does not dispute that Charles Smith spoke with Lee and Misseritti and reported that he heard Plaintiff make them. (Dkt. 44-1 at ¶¶ 46-48.1). Lee and Misseritti interviewed Gaede, then contacted the OMH Albany office to discuss placing Plaintiff on administrative leave or seeking a mental hygiene arrest. (Dkt. 40-1 at ¶¶ 49-50; Dkt. 44-1 at ¶¶ 49-50).

From roughly 10:15 a.m. until noon, six of the Defendants, Griffin, Coffey, Misseritti, Lee, RPC Clinical Director Dr. Larry Guttmacher ("Guttmacher"), and RPC Safety Department Sergeant David Reed ("Reed"), met to discuss Plaintiff's situation. (Dkt. 40-1 at ¶ 52; Dkt. 40-3 at 341-342; Dkt. 44-1 at ¶ 52). During this meeting, Defendants were told the results of the inquiry into Coles' workplace violence report, including that Plaintiff was angry and upset; his previous mental hygiene arrest and the resulting confiscation of his firearms; and his references to suicide, something big happening on Friday, not being at RPC after Friday, and not needing guns because he had a bow and arrow. (Dkt. 40-1 at ¶ 54). Plaintiff disputes being angry or upset and the making of the statements attributed to him, but does not dispute that these statements were reported to Defendants at the meeting. (Dkt. 44-1 at ¶ 54). As a result of this meeting, a collaborative decision was made to call the police regarding a mental hygiene arrest of Plaintiff. (Dkt. 40-1 at ¶¶ 55-56; Dkt. 44-1 at ¶¶ 55-56). This option was chosen over continued administrative leave and an eventual psychiatric evaluation because Plaintiff had referenced suicide and not being there on Friday, so the group felt it best to seek immediate psychiatric attention for Plaintiff by way of a mental hygiene arrest. (Dkt. 40-1 at ¶¶ 57-58;

Dkt. 44-1 at ¶¶ 57-58).  Although Coles initially brought forward the concerns about Plaintiff's behavior, Coles did not participate in this meeting.  (Dkt. 40-1 at ¶ 53; Dkt. 44-1 at ¶ 53).

On March 2, 2016, around noon, the Rochester Police Department ("RPD"), in the presence of RPC security, arrested Plaintiff pursuant to the New York Mental Hygiene Law.  (Dkt. 40-1 at ¶ 59; Dkt. 44-1 at ¶ 59).  Plaintiff was not on RPC grounds at the time, and the individual Defendants were not present at the time of the arrest.  (Dkt. 40-3 at 110-13).  Plaintiff was handcuffed, placed briefly in an RPD police car, then escorted to an ambulance that transported him to Strong Memorial Hospital ("SMH").  (Dkt. 40-1 at ¶ 60; Dkt. 44-1 at ¶ 60).  Plaintiff was discharged at 9:16 p.m. that evening.  (Dkt. 40-1 at ¶ 61; Dkt. 44-1 at ¶ 61).  According to Plaintiff, SMH cleared him to return to work as part of that examination.  (Dkt. 44-1 at ¶¶ 62.1, 70.1).

Unbeknownst to anyone at RPC, at approximately 2:15 p.m. on March 1, Plaintiff contacted OMH's Director of Investigations, William McDermott ("McDermott").  (Dkt. 40-1 at ¶¶ 42, 44; Dkt. 40-2 at ¶¶ 1-3; Dkt. 44-1 at ¶¶ 42, 44).  Plaintiff and McDermott discussed his grievances about RPC, including his complaint about Germain.  (Dkt. 40-1 at ¶¶ 42; Dkt. 44-1 at ¶ 42).  According to Plaintiff, his discussions with McDermott also included complaints of bid rigging and "falsification of documents" on projects to the "Joint Commission."[3]  (Dkt. 44-2 at ¶ 22).

---

[3]     None of the parties have explained the terms "Joint Commission" or "Joint Commission Survey."

After his mental hygiene arrest, Plaintiff contacted McDermott again on March 2, this time from SMH. (Dkt. 40-1 at ¶ 63; Dkt. 44-1 at ¶ 63). After that call, McDermott called Misseritti, who learned for the first time that Plaintiff had previously contacted McDermott. (Dkt. 40-1 at ¶¶ 64-65; Dkt. 44-1 at ¶¶ 64-65).

In a letter dated March 2, Plaintiff was informed by Misseritti that he was placed on administrative leave, with pay, effective March 3, 2016. (Dkt. 40-1 at ¶ 66; Dkt. 44-3 at 16). Plaintiff was not permitted on RPC grounds absent authorization. (Dkt. 44-3 at 16).[4]

On March 23, 2016, Plaintiff filed a complaint with the New York State Division of Human Rights ("NYSDHR"), alleging discrimination on the basis of disability. (Dkt. 44-3 at 34-43). In his NYSDHR complaint, Plaintiff alleged that his mental hygiene arrest was orchestrated due to his reports of workplace violence and corruption, complaining that RPC "knew about prior mental hygiene issues and wanted to exploit this for malicious retaliation for the purpose of ending any investigation." (*Id.* at 39). Neither Defendants nor Plaintiff have provided any evidence of when or even whether RPC received notice of this complaint.

Misseritti testified that she later interviewed Plaintiff on March 31 and April 1, 2016. (Dkt. 40-3 at 337). On April 1, 2016, Plaintiff was notified that RPC had

---

[4]     Plaintiff contends that he was placed on administrative leave on March 1, 2016 (Dkt. 44-1 at ¶ 66), but also testified that his mental hygiene arrest occurred on March 2, 2016, he worked at RPC that day, and the arrest occurred at a pizza shop after he left RPC grounds for lunch. (Dkt. 40-3 at 104, 109). Plaintiff does not claim that this difference in the alleged start date of his administrative leave has any bearing on Defendants' motion. Plaintiff's contention that his administrative leave began on March 1 is contrary to his testimony and in any event, the difference in dates is not material.

determined, pursuant to New York Civil Service Law § 72(5), that his presence in the workplace could be a potential danger to patients, co-workers, or himself. (Dkt. 40-3 at 256). As a result, he was placed on an involuntary leave of absence as of that date and would be required to undergo a medical examination conducted by the Employee Health Service ("EHS"). (*Id.*). Plaintiff underwent that examination on April 18, 2016, and in a letter dated April 27, 2016, EHS determined that Plaintiff was "fit to perform the essential duties of a General Mechanic." (Dkt. 44-3 at 50). Plaintiff returned to work on May 18, 2016. (Dkt. 40-1 at ¶ 73; Dkt. 44-1 at ¶ 73).

Plaintiff initiated this action on August 13, 2016. (Dkt. 1; Dkt. 2). Defendants Burrows and Germain moved to partially dismiss the Amended Complaint. (Dkt. 19). By Decision and Order dated February 3, 2017, this Court granted Germain's motion to dismiss, with prejudice, the sole count against him. (Dkt. 26). Burrows moved to dismiss all four counts in the Amended Complaint brought against him in his personal capacity. This Court granted Burrows' motion to dismiss but granted Plaintiff leave to replead three of the counts. (*Id.*). Plaintiff did not do so, and the Amended Complaint remains the operative pleading.

## DISCUSSION

### I. Legal Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court should grant summary judgment if, after considering the evidence in

the light most favorable to the nonmoving party, the Court finds that no rational jury could find in favor of that party. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

"The moving party bears the burden of showing the absence of a genuine dispute as to any material fact. . . ." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014). "Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial." *Johnson v. Xerox Corp.*, 838 F. Supp. 2d 99, 103 (W.D.N.Y. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)). Specifically, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown*, 654 F.3d at 358. Indeed, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

## II.   Plaintiff's Substantive Rehabilitation Act Claim (Count I)

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . ." 29 U.S.C. § 794(a). The Rehabilitation Act incorporates the definition of "individual with a disability" set forth in the Americans with Disabilities Act of 1990 ("ADA"), which includes "being regarded as having" "a physical or mental impairment that substantially limits one or more major life activities."   42 U.S.C. § 12102(1), (3); 29 U.S.C. § 705(20)(B) (subject to certain exclusions not relevant here, "the term 'individual with a disability' means . . . any person who has a disability as defined in section 12102 of Title 42").   The Rehabilitation Act proscribes discrimination "solely by reason of . . . disability," 29 U.S.C. § 794(a), while Title I of the ADA prohibits discrimination in employment on the "basis of disability," 42 U.S.C. § 12112(a).   The Second Circuit has made clear that the causation standards with respect to employment discrimination claims are the same under both statutes.   *Natofsky v. City of New York*, 921 F.3d 337, 345 (2d Cir. 2019) (holding that 1992 amendments to the Rehabilitation Act adding section 794(d) "displace[d] the causation standard expressed in § 794(a) in the employment discrimination context").

To state a prima facie case for discrimination under the Rehabilitation Act, a plaintiff must show that:

> 1) his employer is subject to the Act; 2) the plaintiff has, or is perceived to have, a disability within the meaning of the Act; 3) the plaintiff was capable of performing the essential functions of the job with reasonable

accommodation; and 4) the plaintiff was subjected to an adverse employment action because of the disability.

*Hatch v. Brennan*, No. 3:16cv795 (JBA), 2018 WL 3421314, at *6 (D. Conn. July 13, 2018), *aff'd*, 792 F. App'x 875 (2d Cir. 2019) (citations omitted). Once the plaintiff has established his prima facie case, "the burden of proof shifts to the defendant to 'articulate some legitimate, nondiscriminatory reason for the' employer's conduct." *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 71 (2d Cir. 2019) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).

With respect to Plaintiff's prima facie case, RPC does not contest that it is subject to the Rehabilitation Act or that Plaintiff was capable of performing the essential functions of his job. Instead, RPC argues that Plaintiff was neither disabled nor perceived to be disabled by RPC and that RPC took no adverse action against Plaintiff on the basis of his disability.

Plaintiff alleges that RPC took a series of specific adverse employment actions that violated his rights. Plaintiff relies on this same list of alleged employment actions in support of his Rehabilitation Act claims and his First Amendment retaliation claim. With respect to his Rehabilitation Act claims, the Court will separate its discussion of these employment actions based on whether they occurred before or after the April 27, 2016, determination that Plaintiff was fit to resume his general mechanic duties ("April 27th Determination").

Plaintiff claims that on March 2, 2016, he was subjected to a mental hygiene arrest, placed on administrative leave, and placed on a "restrictive list," which prevented him from

being present on RPC grounds.  (Dkt. 44 at 11).  Plaintiff also claims that he was subjected

to a second psychological evaluation.  (*Id.*).  All of these actions occurred prior to the April

27th Determination that Plaintiff was fit to resume his duties.

Plaintiff also alleges that he "remained out of work for more than three weeks while

the Joint Commission Survey completed its review of the RPC" and that after he returned

from administrative leave, he was removed from the locksmith overtime list completely,

his administrative duties and unspecified essential responsibilities were removed, his

personal RPC-owned work tools were missing, and his work environment changed because

he was ostracized by supervisors and co-workers and his co-workers made jokes about his

mental hygiene arrest.  (Dkt. 44 at 11; Dkt. 44-2 at ¶ 44).  All of these alleged actions

occurred after the April 27th Determination.

### A.  Alleged adverse employment actions occurring prior to the April 27th Determination

#### 1.  There is a genuine issue of disputed fact as to whether RPC perceived Plaintiff to be disabled prior to the April 27th Determination

There is no dispute that Plaintiff does not claim to be disabled.  Instead, Plaintiff

claims that he never made the statements that led RPC to seek his mental hygiene arrest,

thus either RPC perceived him as having a mental health condition or Defendants

orchestrated his mental hygiene arrest in an effort to silence his complaints about Germain.[5]

---

[5]    The factual underpinnings of these theories appear mutually exclusive, because one theory supports Plaintiff's Rehabilitation Act claims, while the other supports his § 1983 claims.  Nonetheless, Plaintiff is not foreclosed from arguing that Defendants' actions can be viewed as supporting alternate theories of liability.  *Zeranti v. United States*, 358 F. Supp. 3d 244, 260 n.10 (W.D.N.Y. 2019).

RPC appears to argue that Defendants' concerns about Plaintiff's personal safety and the safety of others does not mean that those involved in the decision to seek a mental hygiene arrest perceived Plaintiff as disabled. The sole case cited by RPC in support of its argument, *Bruzzese v. Sessions*, 725 F. App'x 68 (2d Cir. 2018), is inapplicable here. Plaintiff Bruzzese, a Special Agent for the Bureau of Alcohol, Tobacco, Firearms and Explosives, underwent psychological and psychiatric evaluations which did not conclude that he suffered from any disorder, but revealed "personality traits" that supported restricting his ability to carry a firearm absent additional measures, including further training. *Id.* at 71. The court held that in taking action based on those personality traits, the defendant did not perceive Bruzzese as disabled. *Id.* However, Bruzzese did not challenge the underlying evaluations as adverse actions. *Id.* Instead, Bruzzese argued that the results of those evaluations led his employer to find that he was no longer qualified to perform important aspects of his job. *Id.* In contrast, here Plaintiff claims that the mental hygiene arrest and the April psychological examination were themselves adverse employment actions based on his perceived disability.

RPC's justification for the mental hygiene arrest was clearly based in part on concerns that Plaintiff was possibly suicidal and thus should have access to immediate care. RPC employee Charles Smith told Lee and Misseritti that Plaintiff mentioned suicide. In her written "timeline" of events, Misseritti notes a "recent suicide history" and that "due to lethality concerns regarding Mr. Frederick it was felt that a Mental Health Arrest (MHA) would be a more appropriate form of *immediate care* for Mr. Frederick and the safety and security of the facility," as opposed to other means of evaluating Plaintiff, which could

"delay a review/care . . . until a later date, perhaps weeks." (Dkt. 40-3 at 370) (emphasis added). Likewise, on the day of the mental hygiene arrest, Plaintiff was placed on administrative leave and his access to the facility was restricted. RPC's concerns and attempts to secure immediate care for Plaintiff certainly suggest that RPC perceived that Plaintiff had some form of mental health condition.[6]

On April 1, 2016, Misseritti communicated to Plaintiff that RPC was placing Plaintiff on an involuntary leave of absence pursuant to New York Civil Service Law § 72(5), and that he would undergo "a medical and/or psychiatric examination conducted by the Department of Civil Service Employee Health Service." (Dkt. 40-3 at 256). Section 72 governs leave for "ordinary disability" and § 72(5) provides in pertinent part:

> [I]f the appointing authority determines that there is probable cause to believe that the continued presence of the employee on the job represents a potential danger to persons or property or would severely interfere with operations, it may place such employee on involuntary leave of absence immediately; provided, however that the employee shall be entitled to draw all accumulated unused sick leave, vacation, overtime and other time allowances standing to his or her credit. If such an employee is finally determined not to be physically or mentally unfit to perform the duties of his or her position, he or she shall be restored to his or her position and shall have any leave credits or salary that he or she may have lost because of such involuntary leave of absence restored to him or her less any compensation he or she may have earned in other employment or occupation and any unemployment benefits he or she may have received during such period.

N.Y. Civ. Serv. Law § 72(5).

---

[6]     When alleged discrimination is based on a perceived impairment, "[t]he 'regarded as' clause requires a plaintiff to establish 'that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.'" *Donley v. Vill. of Yorkville, New York*, No. 6:14-CV-1324 (MAD/ATB), 2019 WL 3817054, at *3 (N.D.N.Y. Aug. 13, 2019) (quoting 42 U.S.C. § 12102(3)(A)).

There is no evidence suggesting that at the time that RPC placed him on this leave and ordered the psychiatric examination, Misseritti and RPC knew the results of Plaintiff's March 2, 2016, evaluation at SMH. (*See, e.g.,* Dkt. 44-3 at 26). RPC has not suggested that its decision to take action under Civil Service Law § 72(5) was premised on different motivations than the decision to seek his mental hygiene arrest. There is a genuine issue of material fact as to whether, at the time RPC sought Plaintiff's mental hygiene arrest, placed him on administrative leave and on a "restricted list," and ordered a psychological evaluation pursuant to Civil Service Law § 72(5), RPC perceived Plaintiff as disabled.

### 2. The March 2 actions and separate April 2016 psychological evaluation were not adverse employment actions

Plaintiff generally alleges that the mental hygiene arrest was an adverse employment action. "An adverse employment action 'must be more disruptive than a mere inconvenience or an alteration of job responsibilities and might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.'" *Fox*, 918 F.3d at 71-72 (quoting *Patrolmen's Benevolent Ass'n of City of N.Y. v. City of New York*, 310 F.3d 43, 51 (2d Cir. 2002)).

Plaintiff has not alleged that the mental hygiene arrest or the April 2016 psychological evaluation created any change in salary or loss of benefits. Indeed, other than citing the recognized criteria for an adverse employment action, Plaintiff makes no effort to establish how the mental hygiene arrest or the April 2016 psychological evaluation

were adverse employment actions. The mental hygiene arrest was effected outside the workplace, and Plaintiff has not revealed any undisputed facts or cited any precedent to suggest that RPC's decision to contact the RPD and seek a mental hygiene arrest constituted an adverse employment action. *See Farina v. Branford Bd. of Educ.*, 458 F. App'x 13, 17 (2d Cir. 2011) (forcing plaintiff "to take a second fitness for duty evaluation is not evidence of an adverse employment action" (quotation omitted)); *Forgione v. City of New York*, No. 11-CV-5248, 2012 WL 4049832, at * 5 (E.D.N.Y. Sept. 13, 2012) (finding that although plaintiff may have viewed two referrals for psychological evaluations "as inconvenient and unwarranted, and although they may have carried negative connotations, they did not effect a materially adverse change in his working conditions").

There is likewise no evidence that Plaintiff's March administrative leave with pay and concomitant restriction from accessing the facility were adverse employment actions. *Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006) (paid administrative leave was not an adverse action); *Laface v. E. Suffolk BOCES*, 349 F. Supp. 3d 126, 150 (E.D.N.Y. 2018) (temporary paid administrative leave not an adverse employment action), *reconsideration denied*, 2019 WL 1433095 (E.D.N.Y. Mar. 29, 2019); *c.f. Abbott v. Wyo. Cty. Sheriff's Office*, No. 1:15-CV-00531 EAW, 2019 WL 4689045, at *11 (W.D.N.Y. Sept. 26, 2019) (circumstances suggested leave was an adverse action where plaintiff was not paid until the end of three months of administrative leave). Plaintiff makes the conclusory claim that he lost overtime pay as a result of his administrative leave. However, Plaintiff repeatedly testified that his lost access to overtime pay occurred following the February 5, 2016

meeting when Germain told Plaintiff that locksmith DeMarco would respond to requests outside of working hours relating to lock repairs, well before his mental hygiene arrest and administrative leave. (Dkt. 40-3 at 53-54, 143-144, 163). Moreover, although Plaintiff generally claims that he was removed from the overtime list following his administrative leave, Plaintiff does not present any evidence that anyone actually received overtime pay after February 5, 2016.

In sum, Defendants have established that there is no genuine issue of material fact that the March 2 actions and separate April 2016 psychological evaluation were not adverse employment actions, and Plaintiff has failed to come forward with any evidence demonstrating otherwise.

**B.** **There is no genuine issue of material fact that RPC did not regard Plaintiff as disabled after the April 27th Determination that Plaintiff was fit to perform his job duties**

According to Plaintiff, SMH cleared him to return to work when he was discharged from SMH following his mental hygiene arrest. (Dkt. 44-1 at ¶¶ 62.1, 70.1). This is based solely on language in the SMH discharge summary, which states under the heading "General Instructions," "Return to Work/School on: As tolerated." (Dkt. 44-1 at ¶¶ 62.1, 70.1; Dkt. 44-3 at 23). Assuming that this language actually clears Plaintiff to return to work, Plaintiff has not suggested that this information was in any way communicated by him (or anyone else) to RPC. It is, however, undisputed that after the April 2016 evaluation, which determined that Plaintiff was fit to resume his duties, Plaintiff returned to work three weeks later.

Plaintiff alleges that notwithstanding the April 27th Determination, he remained out of work for three additional weeks, he was removed from the locksmith overtime list completely, his administrative duties and unspecified essential responsibilities were removed, his personal RPC-owned work tools were missing, and his work environment changed. However, Plaintiff makes no effort to articulate whether RPC perceived him as disabled after the April 27th Determination. Instead, Plaintiff focuses solely on the events that occurred prior to the April 27 Determination, arguing only that RPC never questioned Plaintiff about his statements until after the mental hygiene arrest and that he was required to undergo an additional psychological evaluation after he was "cleared to return to work on March 2." (Dkt. 44 at 10). With respect to the three-week delay in his return to work, Plaintiff suggests that this was somehow connected to his earlier complaint relating to bid rigging or the falsification of documents (Dkt. 44-1 at 31, ¶ 29), and makes no attempt to tie this delay to any perceived disability. In short, there is no evidence that RPC regarded Plaintiff as disabled after the April 27th Determination.

### C.    Plaintiff has not alleged a hostile work environment claim

In his Amended Complaint, Plaintiff alleges as part of his substantive Rehabilitation Act claim that "RPC's actions created an intimidating, offensive and oppressive work environment, and as a direct result, Plaintiff has suffered from monetary damages in the form of lost wages and emotional distress in the form of pain and suffering." (Dkt. 2 at ¶ 64). It is not clear from this lone allegation whether Plaintiff intended to claim that he experienced a hostile work environment based on a perceived disability.

As part of their motion for summary judgment, Defendants argue in part that Plaintiff cannot maintain a hostile work environment claim. (Dkt. 40-4 at 11, 17-19). If in fact Plaintiff intended to plead such a claim, he has made no attempt to support a hostile work environment claim in his response to Defendants' motion. The factual recitation in Plaintiff's Memorandum of Law notes colloquially at various points that his relationship with Germain was "hostile" beginning in mid-2015 and that after his return to work, Plaintiff's "work environment has been nothing less than hostile." (Dkt. 44 at 2-3, 6). However, Plaintiff does not go on to allege or discuss any purported hostile work environment claim on the basis of a perceived disability in violation of the Rehabilitation Act. If Plaintiff did intend to state such a claim in his Amended Complaint, he has since abandoned it.

For the reasons set forth above, Defendants' motion for summary judgment with respect to Count I is granted.

## III.  Plaintiff's Rehabilitation Act Retaliation Claim (Count II)

Plaintiff alleges in his Amended Complaint that he opposed discrimination based on a perceived disability and was subjected to unlawful retaliation by RPC. (Dkt. 2 at 9-10). "[T]he elements of a retaliation claim under either [the Rehabilitation Act] or the ADA are (i) a plaintiff was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action." *Natofsky*, 921 F.3d at 353 (alterations in original) (quoting *Weixel v. Bd. of Educ. of City of N.Y.*, 287 F.3d 138, 148 (2d Cir. 2002)).

RPC, focusing largely on the mental hygiene arrest, argues that Plaintiff did not allege any protected activity occurring before the mental hygiene arrest. (Dkt. 40-4 at 20-21). In response, Plaintiff points to his filing of a complaint of discrimination with the NYSDHR on March 23, 2016, and alleges that with the exception of the March 2 mental hygiene arrest, administrative leave, and placement on the "restricted list," all of the remaining actions alleged by Plaintiff following Plaintiff's protected activity—the March 23 filing of the NYSDHR complaint—constituted retaliatory activity in violation of the Rehabilitation Act.

Plaintiff's NYSDHR complaint alleged that RPC exploited his previous mental health issues to end any investigation into his reports of workplace violence and corruption by effecting a mental hygiene arrest. (Dkt. 44-3 at 34-43). Assuming that this complaint is protected activity, there is no evidence that Defendant was aware of it.

Plaintiff claims summarily that RPC had notice of his complaint "because they filed a response." (Dkt. 44 at 12). In support of this statement, Plaintiff cites to his Local Rule 56(a)(2) statement of material facts not in dispute, which claims that "[o]n June 30, 2016, RPC filed its response to Frederick's [NYSDRH] complaint." (Dkt. 44-1 at 32, ¶ 32). Plaintiff provides no citation to any evidence at all for this statement, in clear contravention of Fed. R. Civ. P. 56(c)(1). In addition, counsel for Plaintiff's Attorney Declaration purports to attach as Exhibit O a document described as "RPC DHR Response—June 30, 2016." (Dkt. 44-3 at 2). However, the document attached as Exhibit O is not what Plaintiff claims. Instead, it is a letter from the New York State Department of Labor, dated June 30, 2016, notifying RPC Director Coffey of Plaintiff's complaint of retaliation for submitting

a workplace violence complaint with the New York Public Employee Safety and Health Bureau, and what appears to be Coffey's response to that letter.  (Dkt. 44-3 at 52-59).  There is no evidence before the Court that RPC was aware that Plaintiff filed this complaint and thus, no evidence that the alleged retaliators knew that Plaintiff was involved in protected activity.[7]  Accordingly, summary judgment is granted in favor of Defendants on Count II.

## IV.    Plaintiff's Section 1983 Claims (Counts IV, V, and VI)

"In order to maintain a [§] 1983 action, two essential elements must be present: (1) the conduct complained of must have been committed by a person acting under color of state law; and (2) the conduct complained of must have deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994).  Here, Plaintiff alleges that the remaining individual Defendants, Misseritti, Coffey, Lee, Griffin, Guttmacher, Reed, and Coles, retaliated against him for exercising his First Amendment Rights and violated his Constitutional rights by requiring him to undergo a second psychiatric evaluation pursuant to New York Civil Service Law § 72(5) or by effecting his mental hygiene arrest.

### A.    Retaliation in violation of First Amendment rights (Count IV)

A public employee bringing a First Amendment retaliation claim "must establish that: (1) [his] speech or conduct was protected by the First Amendment; (2) the defendant

---

[7]    Although not addressed in Plaintiff's response to Defendants' motion, Plaintiff's Declaration indicates that on May 25, 2016, he "lodged a good-faith complaint of disability discrimination with Coles and Misseritti."  (Dkt 44-2 at ¶ 45).  However, it is unclear from Plaintiff's declaration whether this complaint occurred before or after the alleged adverse actions.

took an adverse action against [him]; and (3) there was a causal connection between this adverse action and the protected speech." *Bloomberg v. N.Y.C. Dep't of Educ.*, 410 F. Supp. 3d 608, 619 (S.D.N.Y. 2019) (original alterations omitted) (quoting *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015) (internal quotation omitted)). Where an "employee has established a prima facie case, the employer may still be entitled to summary judgment . . . by demonstrating by a preponderance of the evidence that it would have taken the same adverse employment action even in the absence of the protected conduct." *Smith v. County of Suffolk*, 776 F.3d 114, 119 (2d Cir. 2015) (internal quotations omitted).

"Public employee speech is protected from retaliation under the First Amendment only where (i) the employee spoke as a citizen, rather than pursuant to official duties, and (ii) the employee spoke on a matter of public concern." *Dingle v. City of New York*, No. 10 Civ. 4 (SAS), 2011 WL 2682110, at *4 (S.D.N.Y. July 7, 2011) (citing *Sousa v. Roque*, 578 F.3d 164, 170 (2d Cir. 2009)). As to the first element of protected speech, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). "The Second Circuit has ruled that 'speech can be "pursuant to" a public employee's official job duties even though it is not required by, or included in, the employee's job description, or in response to a request by the employer.'" *Dingle*, 2011 WL 2682110, at *4 (quoting *Weintraub v. Bd. of Educ. of the City Sch. Dist. of the City of N.Y.*, 593 F.3d 196, 203 (2d Cir. 2010)).

The Court previously granted Defendant Burrows' motion to dismiss because Plaintiff's alleged protected speech, revealing to OMH that RPC provided false information regarding fire codes, conditions of buildings, conditions of doors, and bid rigging, could easily owe its existence to his professional responsibilities as a public employee. (Dkt. 26 at 15 (quoting *Dingle*, 2011 WL 2682110, at \*4)). As the moving party seeking summary judgment, it is Defendants' burden to show "the absence of a genuine dispute as to any material fact." *Crawford*, 758 F.3d at 486. Defendants did not raise the issue of whether Plaintiff's speech was part of his professional responsibilities. With respect to whether Plaintiff's speech was a matter of public concern, Defendants raise this issue in one sentence in their Memorandum of Law, without any citation to the record or legal argument. Defendants have not met their burden on summary judgment, and the Court will assume without deciding that Plaintiff spoke as a citizen on a matter of public concern.

Plaintiff's retaliation claim names all the remaining Defendants. However, it is not apparent from a plain reading of the Amended Complaint who Plaintiff alleges had personal involvement in which (or any) of the alleged adverse actions. "[I]t is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Provost v. City of Newburgh*, 262 F.3d 146, 154 (2d Cir. 2001) (alterations omitted) (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (internal quotation omitted)). Defendants do not raise this issue, and instead argue the legitimacy of the mental hygiene arrest. As such, the Court

will assume, for purposes of Defendants' motion, the personal involvement of the individual Defendants.

Plaintiff alleges that on February 29, 2016, he complained to two individuals at the OMH "Central Office/Internal Affairs Office" about "bid rigging or fixing bids and the falsification of documents on projects to the Joint Commission at RPC by Germain and Coffey." (Dkt. 44-2 at ¶ 20). According to Plaintiff, he was advised to contact McDermott, and did so on March 1. (*Id*. at ¶¶ 20, 22).

Plaintiff has not presented any evidence that any of the Defendants involved in the decision to contact RPD about the mental hygiene arrest[8] were aware of his February 29 contact with the OMH "Central Office/Internal Affairs Office." Likewise, it is undisputed that McDermott did not communicate with anyone at RPC regarding Plaintiff's complaint until after his mental hygiene arrest. Thus, the undisputed facts do not establish any causal connection between this adverse action and the protected speech.

Moreover, even if Defendants were aware of his complaints, Defendants have demonstrated that they would have taken the same action, regardless of Plaintiff's protected activity. Defendants Griffin, Coffey, Misseritti, Lee, Guttmacher, and Reed determined that a mental hygiene arrest was appropriate after discussing the results of the inquiry into Coles' workplace violence report, including that Plaintiff was angry and upset; his previous mental hygiene arrest and the resulting confiscation of his firearms; and his references to suicide, something big happening on Friday, not being at RPC after Friday, and not needing

---

[8]     As discussed below, Defendant Cole was not involved in the decision to effect Plaintiff's mental hygiene arrest.

guns because he had a bow and arrow. Again, Plaintiff disputes the statements attributed to him, but does not dispute that employees reported to Misseritti and Lee that they heard Plaintiff make these statements, and that Misseritti and Lee reported these statements to the remaining individual Defendants involved in the decision.

However, at the time that Plaintiff was placed on administrative leave and on a restricted list, Misseritti was aware that Plaintiff had spoken with McDermott. While placing him on administrative leave and restricting his access to RPC appears justified, the record indicates that Misseritti was aware of Plaintiff's complaints to McDermott on March 2, 2016, after his mental hygiene arrest but prior to her letter placing him on administrative leave. The standard for what constitutes a retaliatory adverse action both under Title VII and in the First Amendment context is broader than in the discrimination context. *Rivers v. New York City Hous. Auth.*, 176 F. Supp. 3d 229, 244-45 (E.D.N.Y. 2016), *aff'd sub nom. Crenshaw v. New York City Hous. Auth.*, 697 F. App'x 726 (2d Cir. 2017). "[R]etaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." *Id.* at 245 (quoting *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 225 (2d Cir. 2006)).

Here Defendants have not addressed the alleged adverse actions raised by Plaintiff and have made no effort to establish the nonretaliatory reasons for his administrative leave, the reasons for the length of this leave, or the delay in returning Plaintiff to work following the April 27th Determination. As a result, Defendants' motion for summary judgment on Count IV is granted with respect to Plaintiff's mental hygiene arrest, but it is denied as to the remaining adverse actions alleged by Plaintiff.

### B.    Abuse of Process (Count V)

In Count V of his Amended Complaint, Plaintiff alleges that Defendants' conduct constituted an abuse of process, because Defendants acted to support an unspecified person's "goal of requiring Plaintiff to undergo a psychology [sic] examination conducted by a consultant from the Employee Health Services."  (Dkt. 2 at ¶ 110).  Defendants correctly note that allegations that state actors abused some form of civil process do not allege a deprivation of a federal right, and thus are not actionable under § 1983.  *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994) (citing *Spear v. Town of West Hartford*, 954 F.2d 63, 68 (2d Cir. 1992)).  Plaintiff did not respond to this argument or make any effort to support his abuse of process claim.[9]  As a result, this claim is abandoned, and Defendants' motion for summary judgment as to Count V is granted.

### C.    False Arrest (Count VI)

"A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law."  *Covington v. City of New York*, 171 F.3d 117, 122 (2d Cir. 1999) (internal quotation omitted).  "This protection adheres whether the seizure is for purposes of law enforcement or due to an individual's mental illness. . . .  To handcuff and detain, even briefly, a person for mental-health reasons, an officer must have 'probable cause to believe that the person presented a

---

[9]    This defect was previously identified in this Court's decision granting Defendants Burrows and Germain's motion to partially dismiss the Amended Complaint.  (Dkt. 26 at 16).  Plaintiff made no effort to replead this Count against Burrows, nor did Plaintiff seek to amend his pleading as to the other Defendants.

risk of harm to [them]self or others.'" *Myers v. Patterson*, 819 F.3d 625, 632 (2d Cir. 2016) (quoting *Kerman v. City of New York*, 261 F.3d 229, 237 (2d Cir. 2001)). "Under New York law, an action for false arrest requires that the plaintiff show that '(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.'" *Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) (quoting *Broughton v. State*, 37 N.Y.2d 451, 456 (1975)). New York law also provides that "the existence of probable cause is an absolute defense to a false arrest claim." *Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006) (citing *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)).

Here the Amended Complaint alleges that the individual Defendants "had plaintiff arrested by Mental Hygiene Arrest." (Dkt. 2 at ¶ 33). There is no allegation that any of the individual Defendants personally detained or arrested plaintiff, or that any of the individual Defendants conspired with another person acting under color of state law (for example, an RPD officer) to confine Plaintiff in violation of his Fourth Amendment rights. Instead, Plaintiff is essentially alleging that Defendants knowingly provided false information to the RPD to induce his arrest.

Neither Plaintiff nor Defendants have addressed whether providing false information to induce an arrest alleges sufficient personal involvement to support a claim for false arrest. *See, e.g.*, *Boyler v. City of Lackawanna*, 287 F. Supp. 3d 308, 326 (W.D.N.Y. 2018) (no personal involvement despite allegation that individual defendants ordered the arrest; neighboring jurisdiction arrested plaintiff and individual defendants were not present during arrest), *aff'd* 765 F. App'x 493 (2d Cir. 2019), *cert. denied* 140 S.

Ct. 63 (2019); *Cruz v. City of New York*, 232 F. Supp. 3d 438, 455-56 (S.D.N.Y. 2017) (dismissing false arrest claim against officer who was present at the scene of the arrest after plaintiff was detained by other officers, but was not personally involved in arrest); *Dallas v. Goldberg*, No. 95 Civ. 9076 WHP, 2000 WL 1092986, at *6-7 (S.D.N.Y. Aug. 4, 2000) (defendant who secured weapons at the scene and searched a female arrestee for weapons not personally involved in arrest). Likewise, no party has addressed whether these allegations properly state a claim for false arrest, as opposed to some other Constitutional tort that has not been pled.

As neither party has briefed these questions, the Court will turn to Defendants' primary arguments. Defendants argue that Coles was not personally involved in determining that the RPD should be contacted to effect a mental hygiene arrest, and thus was not personally involved in any violation of Plaintiff's Constitutional rights. Defendants also argue that those involved in effecting Plaintiff's mental hygiene arrest did not induce the officer to arrest Plaintiff, and that in any event, there was probable cause to believe that Plaintiff was a danger to himself or others.

With respect to Defendant Coles, Plaintiff disputes that he made statements to Coles (or to any other employee) that suggested he might harm himself or others. While Coles did contact Coffey and initiate a workplace violence report, it is undisputed that Misseritti and Lee did not rely solely on Coles' report and instead personally interviewed other RPC employees. It is uncontested that these other employees articulated that Plaintiff made threatening statements and referenced suicide. Most importantly, Plaintiff does not dispute that Coles did not participate in the meeting which resulted in the "collaborative decision"

to seek psychiatric care for Plaintiff by means of a mental hygiene arrest. (Dkt. 40-1 at ¶¶ 53, 55-56; Dkt. 44-1 at ¶¶ 53, 55-56). There is no dispute as to any material fact with respect to Defendant Coles' lack of personal involvement in the decision to effect a mental hygiene arrest of Plaintiff.

With respect to the remaining individual Defendants, in the context of a mental health seizure, to establish probable cause to detain an individual, a defendant need only show a "'probability or substantial' chance of dangerous behavior, not an actual showing of such behavior." *Burdick v. Johnson*, No. 1:06-CV-1465 (LEK/RFT), 2009 WL 1707475, at *5 (N.D.N.Y. June 17, 2009) (quoting *Hoffman v. County of Delaware*, 41 F. Supp. 2d 195, 209 (N.D.N.Y. 1999), *aff'd*, 205 F.3d 1323 (2d Cir. 2000)). Here Plaintiff was arrested pursuant to Mental Hygiene Law § 9.41. (Dkt. 44-3 at 14). Although Plaintiff denied making any threat of suicide, he does not dispute that Charles Smith reported to Misseritti and Lee that Plaintiff made a statement regarding suicide and that this was relayed to Griffin, Coffey, Guttmacher, and Reed, along with information that Plaintiff was angry and upset; his previous mental hygiene arrest and the resulting confiscation of his firearms; and references to something big happening on Friday, not being at RPC after Friday, and not needing guns because he had a bow and arrow.

Although Plaintiff does not directly dispute that employees Craig Smith and Charles Smith reported concerning statements to Misseritti and Lee, Plaintiff attempts to challenge these statements by claiming that they "essentially redacted [sic]" their statements in later interviews. (Dkt. 44 at 17). With respect to both employees, Plaintiff relies on handwritten notes apparently taken by a New York State Department of Labor investigator during

interviews with both employees. (Dkt. 44-1 at 30-31, ¶ 26). These handwritten notes do not contradict Defendants' contention that both employees reported to Lee and Misseritti that Plaintiff made troubling statements. Moreover, Plaintiff does not claim or make any effort to show that these notes constitute admissible evidence. Instead, these notes are merely described as "Dept. of Labor, WPV Investigation Notes." (Dkt. 44-3 at 1). As such, Plaintiff has not shown any issue of disputed material fact.

Defendants have noted a series of concerning statements by Plaintiff, including statements regarding weapons, something "big" happening on Friday, and a reference to suicide. If the Court were to construe the remaining individual Defendants as having "arrested" Plaintiff, this would constitute sufficient probable cause pursuant to Mental Hygiene Law § 9.41. *Hoffman*, 41 F. Supp. 2d at 209. Accordingly, Defendants' motion for summary judgment with respect to Count IV is granted.

## V.  Plaintiff's Labor Law § 740 Claim (Count III) and Defendants' Request for Attorneys' Fees

Plaintiff's Amended Complaint alleges that the individual Defendants violated Labor Law § 740, which:

> creates a cause of action in favor of an employee who has suffered a "retaliatory personnel action" as a consequence of, inter alia, "disclos[ing], or threaten[ing] to disclose to a supervisor or to a public body an activity, policy or practice of the employer that is in violation of law, rule or regulation which violation creates and presents a substantial and specific danger to the public health or safety," or as a consequence of "object[ing] to, or refus[ing] to participate in any such activity, policy or practice in violation of a law, rule or regulation."

*Fough v. Aug. Aichhorn Ctr. for Adolescent Residential Care, Inc.*, 139 A.D.3d 665, 666 (2d Dep't 2016) (alternations in original) (quoting N.Y. Lab. Law § 740(2)(a), (c)).

Defendants argue that Plaintiff has not alleged a violation of any law, rule, or regulation affecting public safety. (Dkt. 40-4 at 22). In response, Plaintiff does not dispute this argument, and "voluntarily dismisses" this cause of action. (Dkt. 44 at 18, n.1). Defendants' motion for summary judgment as to Count III is granted.

Defendants also argue that they should be entitled to fees and costs pursuant to Labor Law § 740(6). Section 740(6) provides that "[a] court, in its discretion, may also order that reasonable attorneys' fees and court costs and disbursements be awarded to an employer if the court determines that an action brought by an employee under this section was without basis in law or in fact." N.Y. Labor Law § 740(6).

Assuming that Plaintiff's Labor Law claim was without basis in law or fact, Defendants have made no effort to support their request, and it is not clear what, if any, fees, court costs, or disbursements Defendants incurred that are attributable to this claim. As such, the Court declines to exercise its discretion, and Defendants' request is denied.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion for summary judgment (Dkt. 40) is granted in part and denied in part. Defendants' motion for summary judgment with respect to Counts I, II, III, V, and VI is granted. Defendants' motion for summary judgment as to Count IV is granted in part and denied in part. Defendants' request for fees and costs is denied.

Defendant Burrows' motion to dismiss was granted by the Court on February 3, 2017, and Plaintiff was granted leave to replead his Amended Complaint against Burrows

(Dkt. 26) but did not do so. The Clerk is directed to dismiss the Amended Complaint against Burrows with prejudice.

SO ORDERED.

_____
ELIZABETH A. WOLFORD
United States District Judge

Dated: March 27, 2020
Rochester, New York